**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. 07-449 |
| v. | : | |
| | : | |
| $39,557.00, MORE OR LESS, IN | : | |
| UNITED STATES CURRENCY | : | |
| | : | OPINION |
| | : | |
| Defendant. | : | |

Presently before the Court is a Motion to Strike the claim of potential claimant Richard Harold ("Harold"). The United States of America (the "Government") argues that Harold's claim to the money should be struck because Harold: (1) lacks statutory standing because he failed to comply with 18 U.S.C. § 983 (a)(4)(A) and Supplemental Rule G(5)(a)(I); (2) lacks statutory standing because he failed to comply with Supplemental Rule G(6)(b) and Fed.R.Civ.P. 33(b)(3) and; (3) lacks both Article III and prudential standing.

A hearing on the issue of standing was held on July 16, 2009 at which time witnesses were presented, including the potential claimant Richard Harold. Following the hearing, the parties were given a briefing schedule and this motion by the Government followed. A second hearing was held on January 25, 2010 on the merits of the present motion. The parties agreed at that time that should the Court find that Harold has standing to make a claim, the parties would like a decision on the ultimate

1

issue of the claim.  The parties also agreed that they have presented all of the relevant information for the Court to make such a determination and they both waived the opportunity to present additional evidence for the Court's consideration.  Having considered the written submissions of the parties and the arguments and testimony presented at both hearings, for the reasons that follow, the Government's motion to strike is granted.

## I. Background

The facts of this case are relatively straightforward and can be summarized as follows.  On July 27, 2006, Harold was a passenger in a vehicle that was proceeding southward on Route 55 in Mantua, New Jersey.  The vehicle, a 2000 Gray Ford Windstar, was being driven by George A. Gardner ("Gardner"). Compl. at ¶7.  Patrolman Douglas Herner ("Herner") of the Mantua Police Department initiated a traffic stop of the vehicle because the van was allegedly traveling above the speed limit and did not appear to have a registration sticker.  Id.  During the course of the traffic stop, Herner alleges that he detected a "strong odor of burnt marijuana emanating from inside the van and noticed marijuana buds on the lap of defendant in interest Richard Harold." Id. at ¶¶ 8 -9.  A review of the DVD memorializing the traffic stop confirms that Herner stated that he smelled marijuana and that he observed what he believed to be ashes or "buds" on Harold's lap.  See DVD at 0:41.

Herner questioned both occupants and performed a frisk search. Compl. at ¶¶ 9-11.  The search of Gardner yielded $4000.00 in United States currency wrapped in black rubber bands.  Id. at ¶ 11.  The officer checked the status of the occupants' driver's licenses and then returned to the minivan to collect "the marijuana buds that became

2

enmeshed in the floorboard carpeting and crumbled.  The officer found a yellow 'Joyce Leslie' bag beneath the passenger seat that contained a black bag with a large quantity of United States currency bundled in black rubber bands." Id. at ¶ 14.

A second Mantua police officer arrived on the scene and aided in the search.  The search produced a black purse from beneath the back bench containing a large amount of money.  Id. at ¶ 15.  The second officer also smelled a strong odor of raw marijuana and observed "out of place bolts on the housing underneath the steering column." Id. at ¶ 15; see also DVD at 29:22.  A search of the column did not reveal anything. Compl. at ¶ 15.  Both Gardner and Harold were read their Miranda rights and then questioned about the money.  Id. at ¶¶ 17-19.  Gardner refused to answer any questions and Harold responded that he was "unaware of any money in the van".  Id. at ¶ 18.  Herner took possession of the money.

After Gardner was issued a summons for driving while suspended, the two men were released and they drove to the Mantua police station where they were given a receipt for the confiscated money.  Id. at ¶¶  19-20.  A Drug Enforcement Administration ("DEA") task force officer was notified of the situation and a K-9 search of the currency indicated the presence of narcotic residue.  Id. at ¶¶ 21-22.  An additional count of the seized currency was made by a DEA officer, resulting in a total of  $43, 557.00.  Id. at ¶ 23.

No charges were ever brought against Harold or Gardner for the presence of the alleged marijuana found in the vehicle.  And the substance that Herner alleged to be marijuana was never tested or confirmed to be an illegal substance.  The only infraction that resulted from the traffic stop was the ticket issued to Gardner for driving with a

3

suspended driver's license.

The DEA initiated separate administrative forfeiture proceedings against the $4000.00 found on Gardner and the $39,557.00 collectively found in the Joyce Leslie bag under the passenger seat and the black purse found below the back bench seat. Neither Gardner nor Harold made a claim for the $4000.00. But Harold filed a claim against the seized $39,557.000 currency.  As a result of Harold's claim, the DEA terminated the administrative forfeiture proceedings.  The matter was subsequently referred to the United States, which instituted civil forfeiture proceedings against the defendant currency in the amount of $39,557.00.  Harold seeks to challenge the forfeiture.

## II. Discussion

The Third Circuit requires that Harold demonstrate both statutory standing and Article III standing before he can challenge the forfeiture.  U.S. v. $8,221,877.16 in U.S. Currency, 330 F.3d 141, 150, n.9 (3d Cir. 2003)(citing U.S. Contents of Accounts Nos. 3034504504 & 14407143 (In re Friko Corp.), 971 F.2d 978, 984 (3d Cir. 1992)). "Statutory standing is a *threshold* issue that determines whether a party is properly before the court."  Id.  Should the Court find that Mr. Harold has demonstrated statutory standing, the next consideration is whether he has perfected Article III and prudential standing.

### A.  Statutory Standing- Compliance with Supplemental Rules G(5)(a)(i)(B) & (C) and G(6)

To establish statutory standing in a forfeiture action, a potential claimant must comply with both the statutory and procedural requirements delineated in 18 U.S.C. §

983(a)(4)(A) and the corresponding Supplemental Rules for Admiralty or Maritime

Claims And Asset Forfeiture Actions (Supplemental Rules), specifically Rules

G(5)(a)(i)(B) & (C).  In relevant part, 18 U.S.C. § 983(a)(4)(A) provides:

> In any case in which the Government files in the appropriate United States district court a complaint for forfeiture of property, any person claiming an interest in the seized property may file a claim asserting such person's interest in the property in the manner set forth in the Supplemental Rules for Certain Admiralty and Maritime Claims, except that such claim may be filed not later than 30 days after the date of service of the Government's complaint or, as applicable, not later than 30 days after the date of final publication of notice of the filing of the complaint.

Supplemental Rule G(5)(a)(i) states:

> A person who asserts an interest in the defendant property may contest the forfeiture by filing a claim in the court where the action is pending.  The claim must: (A) identify the specific property claimed (B) identify the claimant and state the claimant's interest in the property; (C) be signed by the claimant under penalty of perjury; and (D) be served on the government attorney designated under Rule G(4)(a)(ii)(C) or (b)(ii)(D).

At issue here is whether Harold has sufficiently identified his ownership interest

and his compliance with the verification requirement. Rule G(5)(a)(i)(a)& (B) & (C).

With regard to the claim of ownership, there are competing views on the amount of

information that is necessary to satisfy this requirement.  Supplemental Rules

G(5)(a)(i)(A) & (B) are silent as to the amount of information necessary to satisfy this

obligation.  Some courts have held that a simple claim of ownership will suffice.  <u>See,

e.g.</u>, <u>U.S. v. $191,910.00 in U.S. Currency</u>, 16 F.3d 1051, 1058 (9th Cir. 1994) ("a simple

claim of ownership will be sufficient to create standing to challenge a forfeiture")

*superseded by statute on other grounds as stated in* <u>U.S. v. $80,180.00 in U.S.

Currency</u>, 303 F.3d 1182, 1184 (9th Cir.2002); <u>U.S. v. $40,000 in U.S. Currency</u>, 763

5

F.Supp. 1423, 1427 (S.D Ohio 1991)(holding that potential claimant "need not supply facts" in identifying ownership interest and that such information "become[s] important later in a forfeiture proceeding)"; <u>U.S. v. $80,760.00 in U.S. Currency</u>, 781 F.Supp. 462, 467 n. 15 (N.D.Tex. 1991)(stating that a demand "that claimants show a legitimate source [explaining their interest in the property] for the purpose of establishing standing improperly accelerates the claimants' ultimate burden"). However, the Third Circuit recently held that a purported verified claim was deficient because it "contain[ed] no description of [potential claimant's] interest in the property, which Rule C(6) requires." <u>U.S. v. $487,825.00 in U.S. Currency</u>, 484 F.3d, 662, 665 (3d Cir. 2007).

Harold's claim, filed by way of letter dated February 28, 2007 with his affidavit attesting to ownership attached, is deficient. The "claim" fails to sufficiently identify Harold's interest in the currency, instead offering a bald assertion of ownership. <u>See</u>, <u>id.</u> In addition, the attached affidavit was not properly verified. It was submitted in support of Harold's claim in the administrative forfeiture proceeding and was, therefore, sworn to before the filing of the civil forfeiture proceedings. The Third Circuit has stated that the verified statements of interest filed in the context of the administrative forfeiture proceedings "while perhaps providing some type of notice to the Government, are not substitutes for the Rule C(6) verified statement, nor do they prevent the Government from claiming prejudice." <u>U.S. v. $31,8052.38 in U.S. Currency</u>, 183 Fed.Appx. 237, 240-41 (3d Cir. 2006). Courts, including the Third Circuit, "have repeatedly emphasized that forfeiture claimants must strictly adhere to the filing requirements to perfect standing." <u>$ 487,825.00 in U.S. Currency</u>, 484 F.3d at 664-665 (citing <u>U.S. v. One-Sixth Share of James J. Bulgar In All Present & Future Proceeds Of Mass Millions Lottery</u>

Ticket, No. M246233, 326 F.3d 36, 41-41 (1ˢᵗ Cir. 2003); see also U.S. v. Real Property,

135 F.3d 1312, 1316-17 (9ᵗʰ Cir. 1998)). The reasoning underscoring these decisions is the

belief that strict adherence to the requirements "minimize[s] the danger of false claims

by requiring claims to be verified or solemnly affirmed" and ensures quick resolution of

the dispute.  Id. (quoting $8,221,877.16 in U.S. Currency, 330 F.3d at 150 n.9).  Thus,

the Third Circuit has identified compliance with Supplemental Rule G(5)(a), that the

claimant must file a verified statement of interest, as "the most significant requirement."

$487, 825.00 in U.S. Currency, 484 F.3d at 664 (citing $8,221,877.16 in U.S. Currency,

330 F.3d at 150 n. 9).[1]  And the requirement is "no mere procedural technicality." U.S. v.

---

[1]Prior to the amendment of the Supplemental Rules, the Third Circuit treated the verification requirement liberally, in furtherance of the "time-honored admiralty principle that pleadings and procedural practices in maritime actions should be applied liberally."  U.S. v. Various Computers & Computer Equip., 82 F.3d 582, 585 (3d Cir. 1996).  The potential claimant in Various Computers did not file a verified answer in the civil forfeiture proceedings. 82 F.3d 582. In a related criminal proceeding, the potential claimant was ordered to pay restitution as part of a guilty plea to criminal charges stemming from unauthorized use and possession of stolen credit cards; he used these credit cards to purchase the computers subject to civil forfeiture. Id. Because the criminal order of restitution came from the same district court hearing the civil forfeiture action, the Third Circuit found that "[b]oth the court and the Government were aware of the source of [potential claimant's] interest in the property and the basis for his claim of ownership." Id. at 585.  For this reason, "the verification would not have added to the authenticity of [potential claimant's] petition." Id.

Other courts have also applied liberal consideration to the verification requirement. See U.S. v. Funds From Prudential Securities, 300 F.Supp.2d 99, 105 (D.D.C. 2004); U.S. v. Premesis and Real Property at 4492 South Livonia Road, Livonia, N.Y., 889 F.2d 1258 (2d Cir. 1989). The majority of these cases, however,  involve a *pro se* potential claimant whose status warranted relaxation of the rules.  See, e.g., Various Computers & Computer Equip., 82 F.3d at 585.  But, there are cases that involve represented parties where a technically faulty attempt at compliance with the rules was accepted.  In such cases, the court's focus was to ensure that "the underlying goals of [the Rule] are not frustrated to ensure that courts decide controversies on the merits." Funds From Prudential Securities, 300 F.Supp.2d at 105, n.11 (citations omitted).  For example, in Premesis and Real Property at 4492 South Livonia Road, Livonia, N.Y., the Court of Appeals for the Second Circuit found that where the potential claimant "made a sufficient showing of interest in the property through filing with the court a motion and accompanying

<u>Commodity Acct. No. 549 54930</u>, 219 F.3d 595, 597 (7th Cir. 2000).  Harold's submissions fail to adhere to these standards.

Likewise, Harold's answer is unverified.  <u>See</u> Government Ex. E.  In addition, Harold's responses to the Government's Rule G(6) special interrogatories were not verified consistent with Fed.R.Civ.P. 33(b)(3), despite extensions of time to properly answer.  The Court again provided multiple opportunities for Harold to file sufficient responses.  But Harold's responses were vague until August 2008, when he identified the source of his money as inheritance from his deceased grandmother, in an <u>unverified</u> statement made by his counsel in violation of Fed.R.Civ.P. 33(b)(1)(A).  <u>See</u> Gov. Ex. H.  Therefore, Harold's Rule G(6) submissions are deficient.

In an attempt to demonstrate compliance, Harold argues that his filings satisfied the "spirit" of the Rules, which he argues are difficult to follow and pose a "trap" for the unwary.  Harold does not argue that he complied with the Rules, however.  Despite many extensions, Harold never fully complied with the rules and as a result deprived himself of statutory standing.  Harold's claim is therefore struck for lack of statutory standing.

And while his lack of compliance with the Rules alone provides sufficient grounds

---

affidavits, technical noncompliance with the procedural rules governing the filing of claims may be excused." 889 F.2d 1258 (2d Cir. 1989)(citing <u>U.S. v. U.S. Currency in the Amount of $2,857.00</u>, 754 F.2d 208, 213 (7th Cir. 1985)).

All of these cases, including <u>Various Computers</u>, were decided before the most recent amendment to the Supplemental Rules.  Not only are the facts of <u>Various Computers</u> factually distinguishable from the present matter, but the circumstances in that case were "extraordinary".  <u>$31,8052.38 in U.S. Currency</u>, 183 Fed.Appx. at 241 (citing <u>Various Computers</u>, 82 F.3d at 585).  For all of theses reasons, the Court will apply the Third Circuit's recent jurisprudence on the issue.

to strike his claim, it also undermines his proofs offered in support of Article III and prudential standing. See $31,8052.38 in U.S. Currency, 183 Fed.Appx. at 240-41 (affirming the striking of a claim where the potential claimant filed a verified claim only in the administrative forfeiture proceedings and not in the civil forfeiture proceedings); see also $487,825.00 in U.S. Currency, 484 F.3d at 664-65 (affirming the striking of a claim where the potential claimant's answer and claim did not sufficiently describe his interest in the property.

**B. Article III Standing**

To perfect Article III standing, a potential claimant must demonstrate ownership or interest in the money sufficient to create a "case or controversy." In re Fricko Corp., 971 F.2d at 984. The potential claimant bears the burden of proving ownership by a preponderance of the evidence. See Supp. R. G(8)(c)(ii)(B). To create a "case or controversy" the potential claimant must demonstrate a colorable interest in the money. Munoz-Valencia v. U.S., 169 Fed.Appx. 150, 152 (3d Cir. 2006). A colorable interest is established where a potential claimant exercises dominion or control over the property. Id. Physical possession of the property alone does not necessarily constitute dominion or control. Id.

Here, Harold has not demonstrated a colorable interest in the seized money sufficient to confer Article III standing. First, none of the seized currency was found on his person. A portion of the money was in a bag within a bag in a compartment under the passenger seat occupied by Harold. Another portion of the money was found in a lady's purse underneath the back bench seat of the van. And $4000.00 was found on

Gardner.[2]  In addition, Harold has no ownership interest in the vehicle where the money

was found; the van was registered to "Daphne Mossop."  See Compl. at ¶2.  As a result,

there is no readily apparent or obvious possessory interest. See  Mantilla v. U.S., 302

F.3d 182, 185 (3d Cir. 2002)(finding no possessory interest in seized money because,

inter alia, the money was confiscated from a vehicle that potential claimant did not own

or possess).

Second, during the course of the underlying traffic stop, Harold verbally denied

any interest in and/or knowledge of the money found in the van.  When questioned by

Patrolman Herner about the money, Harold renounced ownership.

> Harold: "My money?"
> Herner: " Yeah, is that your cash underneath the passenger seat where you
> were?  Is that your money? No, you don't know anything.  I just want to
> get it documented because everything is being recorded right now.  You
> have no idea about that money underneath your passenger seat?"
> Harold: "No."

DVD 23:51; T. 60: 12-14.  At the evidentiary hearing, Patrolman Herner explained that

during this conversation, Mr. Harold shook his head side to side, indicating "No" in

response to his question "Is that your money?" prompting Herner to memorialize the

nonverbal response on the audio/visual recording system by stating "No, you don't

know anything." T. 59:20-60:10. During the evidentiary hearing and subsequent oral

---

[2]Neither Gardner nor Harold made a claim in the administrative forfeiture proceedings related to the $4000.00 found on Gardner's person and this money was administratively forfeited. However, in the administrative forfeiture proceedings against the $39,557.00, Harold filed an affidavit claiming ownership of $43,557.00.  Government Ex. A, Harold Aff., ¶3.  This amount appears to be an aggregate of the $39,557.00 that is the subject of the present action and the $4000.00 found on Gardner's person that was administratively forfeited.  This attempt by Harold to pursue and then abandon a claim for an amount greater than he now seeks causes the Court to doubt the reliability of Harold's assertions.

argument on the present motion to strike, Harold's counsel suggested that it is Herner-
and not Harold- who utters "No" in response to Herner's question of whether Harold
owns the money.[3]  The Court has reviewed the DVD memorializing the traffic stop and
finds that it is in fact Harold who responds "No", demonstrating a lack of dominion or
control over the money.  See U.S. v. $141,480.00 in U.S. Currency, slip op. at 7-8 (S.D.
Fla. Jan. 10, 2001)(where potential claimant denied ownership of the currency at the
scene and the currency was confiscated from an apartment that was not owned by
potential claimant, the court found no constructive possession or possessory interest
sufficient to confer standing)(citing U.S. $364,960.00 in U.S. Currency, 661 F.2d 319,
327 (5th Cir. 1981)(remanding for an evidentiary hearing where the potential claimant
denied possession and ownership of the property) *superseded by statute on other
grounds as stated in* U.S. v. $$92, 203.00 in U.S. Currency, 537 F.3d 504, 508 (5th
Cir.2008)).

        Third, Harold cannot overcome his initial renouncement of the money by his
subsequent offers of proof to demonstrate ownership by a preponderance of the
evidence.  Even if Harold's protestation that he did not respond "No" was not
contradicted by the evidence, Harold's responses and behavior are not consistent with

---

        [3]At the evidentiary hearing, Harold claimed that he could not identify his own voice on
the recording of the traffic stop. T. 52-53.  He also claimed that he was unable to discern the
voice's responses.  T. 49-51.  The video does not physically capture the speakers during the
exchange regarding ownership of the money.  Earlier in course of the traffic stop, Gardner is
removed from the van and questioned by Herner.  His responses are clear and his voice is
distinguishable from Harold's voice.  DVD 2:23. Having had the opportunity to listen to
Harold's testimony at the evidentiary hearing and having reviewed his speech on the DVD, the
only conclusion that can be reached is that it is Harold who utters "No" and renounces the
money.  And around the time that the phrase "No" was uttered in response to Herner's question
about the money, Harold agrees that the voice on the tape "sound[s] like [his] voice."  T. 52:17.

ownership of the money.  In addition to making no affirmative claim to the money at the scene, Harold again said nothing about his alleged interest in the money at the police station when Gardner was offered an opportunity to sign the seizure form.  See Herner Testimony, T. 74:16 to 75:16.  Clearly, Harold's words and actions are inconsistent with ownership.

In addition, Harold's statement that he received the money as inheritance from his deceased grandmother did not come until August 6, 2008, in an unsworn statement made by his attorney. See Gov. Ex. H.  The failure to identify this interest under oath at the outset is troubling.  Although Harold eventually testified under oath that the money came from his inheritance during the evidentiary hearing, the Court is not persuaded by the evidence.  His failure to be forthright, coupled with the inconsistencies and implausibilities in the evidence, all counsel against a finding of standing.

Significantly, the facts related to how and when Harold came into possession of the inheritance are unclear.  Harold's aunt, Brenda Joseph[4], testified, rather vaguely, that she gave Harold a manilla envelope, that purportedly contained the money, when "he was young."  T. 135:19-20.  However, Harold claims that he received the money days before the traffic stop that lead to the seizure of the money, when he was approximately 23 years old.  T: 16;16-21.  Ms. Joseph also testified that the money was given to Harold in a manilla envelope that was kept in a "tin box [that] looked like a lunch box." T: 134;6-10.

This testimony contradicts Harold's answer to the Rule G(6) special

---

[4]It appears that Brenda Joseph is also known as, or at least has been referred to as, Brenda Clark.

interrogatories submitted by his counsel on August 1, 2008 that states:

> The money seized was left to me by my Grandmother, Mildred Clark, who is now deceased.  My Grandmother previously resided in Newtonville, New Jersey.
> The money was recovered from my Grandmother's house after her death.
> It was found in various bags, purses other containers by my Aunt, Brenda Clark. My Aunt was aware from various conversations with my Grandmother that she desired for me to have the money come to me.
> Some of it was still in the same purses and bags in which it was found.
> It was still in some of the containers at the time it was illegally taken by the Mantua Police.

Answer to Special Interrogs. ¶4 (emphasis added).  And Harold offered a different version of events at the evidentiary hearing, claiming that the money was given to him only in the Joyce Leslie bag.

> Q. How was the money presented to you?
> A. It was all in the bag.
> Q. Which bag?
> A. The Joyce Leslie bag.
> Q. Was it inside any other bag or just inside the Joyce Leslie bag?
> A. Just inside that bag.

T. 34:7-13.

Further undermining Harold's claim is the fact that portions of the seized currency was not in circulation until after his grandmother's death.[5]  Brenda Joseph testified that Harold's grandmother personally prepared all of the envelopes that Ms. Joseph distributed to various family members, including the envelope given to Harold.

---

[5]In a Declaration, David A. Duttonhofer, Jr., an employee of the Federal Reserve Bank, stated that a review of the seized currency revealed that certain bills were made available to the public after Harold's grandmother's death in December 1996.  The seized 1996 Series $50 bills were placed into circulation in October 1997. See Gov. Ex. K., Duttenhofer Decl., ¶8. The seized 1996 $20 bills were placed into circulation in September 1998. Id. at ¶9.  But the seized 1996 series $100 bills were introduced to the public in March 1996, several months before Harold's grandmother died.  Id. at ¶7.

T. 137: 13-23.  Given that Harold's grandmother died in December 1996, it is impossible that all of the seized money that Harold seeks to claim came from his grandmother; portions of the currency were not in circulation until after she died.  Ms. Joseph also testified that she did not open or look at the contents of the envelope.  T. 133:6-10.

Finally, with respect to the traffic stop, Harold testified that all of his money was in the bag found underneath his passenger's seat.  T. 14:11-25.  His testimony does not account for the second bag of money found underneath the back bench seat, counseling against a finding of control or dominion.

Harold has failed to establish by a preponderance of credible evidence an interest sufficient to confer Article III standing.  Harold has offered conflicting and inconsistent statements regarding his interest in the money.  He initially disavows knowledge of the money, does not make any forthright claim at the time of seizure, and then baldly claims ownership.  He never identifies the inheritance as the source of his ownership in any sworn statement or answer to the Government's Rule G(6) special interrogatories.  Likewise, his statements and demeanor at the evidentiary hearing call his credibility into question.  Even if the Court were to give Harold the benefit of the doubt, the fact that he claims to have inherited money that was not yet in circulation is incredible and unworthy of credence.  Moreover, Harold did not own the vehicle from which the money was confiscated.  None of the currency was seized from his person and Harold gives an inaccurate account of where the money was found in the van.  For all of these reasons, there is no evidence from which a reasonable trier of fact could recognize a colorable claim to the currency sufficient to perfect Article III standing.  As a result, the Court strikes Harold's claim to the currency.

### C. Prudential Standing

Prudential standing is a requirement that goes beyond Article III standing that decides whether the claimant is in the zone of interests intended to be protected by the statute. U.S. v. Real Property located at 730 Glen-Mady Way, 590 F.Supp.2d 1295, 1302 (E.D. Cal. 2008).  The Government claims that Harold must also demonstrate prudential standing in order to contest the seizure.  While there is no Third Circuit case that so requires, the Government argues that Harold cannot demonstrate prudential standing.  Having struck down Harold's claim for lack of statutory standing and for want of Article III standing, a discussion on the merits of Harold's prudential standing is unnecessary.  For the sake of completeness, however, the Court finds that Harold's claim would also be struck on this ground.  Because Harold initially disclaimed ownership in the money, he took himself out of the "zone of interest."  Thus, for the same reasons Harold failed to establish Article III standing, the Court finds that he also lacks prudential standing.

### III. Conclusion

For the reasons stated herein, the claim of Richard Harold is struck for want of statutory standing, Article III standing, and prudential standing. The Court denies the Government's request for attorney's fees and costs in this case.  An appropriate Order shall issue.

Dated: February 9 , 2010

/s Joseph H. Rodriguez

Hon. Joseph H. Rodriguez,
United States District Judge

15